708 S.E.2d 491

**STATE of West Virginia, Plaintiff
Below, Appellee**

v.

**Justin Keith BLACK, Defendant
Below, Appellant.**

**No. 34722.**

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 12, 2010.

Decided March 4, 2010.

Jay C. Love, Huntington, WV, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, R. Christopher Smith, Assistant Attorney General, Charleston, WV, for the Appellee.

DAVIS, Chief Justice:

The defendant below and appellant herein, Justin Keith Black (hereinafter "Mr. Black"), appeals from an order entered July 2, 2008, by the Circuit Court of Cabell County. By that order, the circuit court sentenced Mr. Black to a period of forty years in the penitentiary following Mr. Black's jury conviction of second degree murder in violation of W. Va.Code § 61–2–1 (1991) (Repl.Vol.2005).[1] On

---

1. W. Va.Code § 61–2–1 (1991) (Repl.Vol.2005) provides:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A–4–401 et seq.], chapter sixty-a of this

appeal to this Court, Mr. Black sets forth numerous assignments of error, which will be addressed in this opinion. Based upon the parties' written arguments, the record designated for our consideration, and the pertinent authorities, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On August 8, 2002, the dead body of Ms. Deanna Crawford was found by some loggers on Hickory Ridge located in Cabell County, West Virginia. The initial investigation focused on a suspect who was subsequently cleared by the police department, and the case went cold for several years.[2] Then, in January 2007, the police received information that a man named Brian Dement was involved with the murder, along with Mr. Black, Nathan Barnett, and Phillip Barnett.

Brian Dement was questioned by the police and provided several statements,[3] all of which were different regarding his degree of participation in the matter. He gave a statement to the police detailing that he, along with Mr. Black, Phillip Barnett, and Nathan Barnett, was at a party on or about August 5, 2002, at Mr. Black's residence. He provided that he and the aforementioned persons left the party, along with Ms. Crawford, in a car that was driven by Mr. Black. Brian Dement further claimed that they stopped the car at an abandoned farm, that they all phys-

ically assaulted Ms. Crawford with kicks and punches, and that she was eventually killed.[4] While Brian Dement's statements contained conflicting versions of his own participation in the murder, his last statement admitted his hands-on involvement in the crime. He was eventually arrested.

Mr. Black heard that the police were looking for him as a result of Brian Dement's statements, and he agreed to meet at the police detachment. Once there, he was Mirandized.[5] While his statement provided a very limited version of his role in the events, he eventually admitted that he was with the victim, Brian Dement, Phillip Barnett, and Nathan Barnett on the evening in question. He further admitted that he drove them from the party at his house to a place on Hickory Road where there was an abandoned building. He stated, however, that he stayed at the vehicle while the others went to the area that became the crime scene. According to Mr. Black, Phillip and Nathan Barnett eventually returned to the car red-faced and the three of them left, leaving the victim and Brian Dement behind. Mr. Black recanted his statement one week later, alleging he had been coerced into providing details that had been supplied to him by law enforcement officials and that, in actuality, he had no knowledge of the crime or victim in question. He was indicted for murder in May 2007, along with Brian Dement,[6] Philip Barnett, and Nathan Barnett.[7]

---

code, is murder of the first degree. All other murder is murder of the second degree.

In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

2. The original suspect died in 2003, but Trooper Cummings testified that this person had already been excluded by the police department during its investigation.

3. Brian Dement was afforded his *Miranda* warnings prior to providing his accounts of the facts to the police. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Brian Dement's various versions of the facts will be discussed in greater detail in the assignments of error. Further discussion will include the various recantations by Brian Dement, including statements that Mr. Black was not involved in the crime.

5. *See* note 3, *supra.*

6. Brian Dement entered into a plea agreement with the State. He pleaded guilty to second degree murder and promised to testify truthfully in the trials of his co-defendants. In exchange, the State agreed to recommend a prison sentence of twenty to twenty-four years.

7. Nathan and Phillip Barnett, brothers, were tried jointly, but in a separate trial from Mr. Black. Their convictions are currently on appeal before this Court.

Mr. Black was tried by a jury beginning April 15, 2008.[8] At Mr. Black's trial, Brian Dement testified that, on the night in question, upon arriving at the abandoned building, Phillip Barnett punched the victim in the side of the face. The four men, including Mr. Black, then began screaming at the victim. Brian Dement testified that he grabbed the victim around the neck and pulled her up a path while the other three men followed and punched and kicked and beat on her. Brian Dement stated he eventually released his own hold on the victim and went into the woods while the other three men continued to beat her. Brian Dement testified that he could hear the victim screaming for her life then everything went quiet. The other three men left in the car while he hid in the weeds. Brian Dement then went to check on the victim and found that she was dead. Two inconsistent statements of Brian Dement's previous statements were then played for the jury. Brian Dement spoke with two private investigators[9] prior to Mr. Black's trial. In both of those conversations, he recanted his confession related to Ms. Crawford's murder. Further, he explained that, once he realized the amount of trouble he was in, he felt he had no choice but to accept the State's plea offer, which included testifying truthfully against Mr. Black. Both of these statements were introduced at Mr. Black's trial by the defense.

At his trial and in contradiction to his original statement provided to the police, Mr. Black testified that he did not know the victim, Deanna Crawford; that she was never at a party at his house; and that Brian Dement was never at a party at his house.[10] Mr. Black testified that he had no involvement with any events that resulted in Deanna Crawford's death. Furthermore, he testi-

fied at trial that his previous statement to the police, wherein he admitted driving a car with the victim and the three other men from a party at his house, was provided to the police as a result of the police feeding him details of the crime and threatening to revoke his parole[11] if he refused to tell them what they wanted to hear.

The medical examiner testified at trial that, in addition to bruises and lacerations on her body, the victim had a fracture of the hyoid bone and a laceration of the right thyroid cartilage. He testified that this physical evidence indicated that the victim was strangled, which was the cause of her death.

On April 21, 2008, Mr. Black was found guilty by a jury of second degree murder. He was sentenced to forty years of confinement in the West Virginia Penitentiary on June 6, 2008. His motion to set aside the verdict was denied on July 2, 2008, and he was re-sentenced. Mr. Black appeals to this Court and asserts numerous assignments of error that will be fully discussed herein.[12]

## II.

### STANDARD OF REVIEW

■ In this case, we are called upon to review assignments of error that have specific standards of review. The particular standards of review will be indicated for each assignment of error. As a general matter, however, we have held that,

[i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error

---

**8.** Mr. Black had previously started trial in February 2008. However, the first trial ended in a mistrial as a result of a testifying police officer's reference to a polygraph test in violation of Syllabus point 2, *State v. Chambers*, 194 W.Va. 1, 459 S.E.2d 112 (1995), which holds that "[r]eference to an offer or refusal by a defendant to take a polygraph test is inadmissible in criminal trials to the same extent that polygraph results are inadmissible."

**9.** The first conversation took place in October 2007 and was recorded without his knowledge.

In March 2008, the second conversation was recorded with his consent.

**10.** The factual version testified to at trial by Mr. Black was consistent with his recantation to the police, which occurred one week after his initial statement to the police.

**11.** Mr. Black was on parole for a malicious wounding charge.

**12.** Other relevant facts are discussed under the assignments of error.

under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). Mindful of these applicable standards, we now examine the individual issues presented in this appeal.

## III.

## DISCUSSION

On appeal to this Court, Mr. Black sets forth the following assignments of error: (1) the trial court erred in admitting Mr. Black's statements to the police into evidence; (2) the trial court erred in excluding expert testimony on false confessions; (3) the trial court improperly excluded Mr. Black's proposed rebuttal testimony; (4) the trial court erred in striking, as irrelevant, testimony by Jessica Carson; (5) the trial court erred in denying Mr. Black's motion for change of venue; (6) the prosecuting attorney failed to disclose exculpatory evidence to Mr. Black prior to trial; (7) the trial court erred in denying Mr. Black's motion to exclude all state witnesses who were intended to establish Mr. Black's presence at the scene of the alleged offense and any other witness to rebut Mr. Black's alibi evidence; and (8) the trial court erred in allowing the State, during its closing arguments, to make references to inadmissible out-of-court statements. Each assignment of error will be addressed individually in this opinion.

### 1. Admission of Mr. Black's Statements

The first issue set forth by Mr. Black is that his statements made to the state troopers should not have been admitted into evidence because they were involuntary. Mr. Black asserts that he told the police what they wanted to hear because he was afraid his parole would be revoked.[13] In response, the State argues that the trial judge held a hearing and heard extensive evidence on the issue, with the finding that the statements were voluntary.

As an initial matter, we recognize that "[i]t is a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." Syl. pt. 2, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978). Further, "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. pt. 3, *id.* But *cf.* Syl. pt. 2, *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994) ("This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.").

As this Court has previously recognized,

"[i]t is the mandatory duty of a trial court, whether requested or not, to hear the evidence and determine in the first instance, out of the presence of the jury, the voluntariness of an oral or written confession by an accused person prior to admitting the same into evidence." Syllabus Point 1, *State v. Fortner*, 150 W.Va. 571, 148 S.E.2d 669 (1966), *overruled in part, State ex rel. White v. Mohn*, [168] W.Va. [211], 283 S.E.2d 914 (1981).

Syl. pt. 2, *State v. Persinger*, 169 W.Va. 121, 286 S.E.2d 261 (1982). Further, the burden of proving the voluntariness of any statements rests with the State. *See* Syl. pt. 3, *Persinger, id.* (" 'The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case.' Syllabus Point 5, *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975)."). Of specific relevance to the appeal currently before this Court regarding Mr. Black's contentions

---

13. *See* note 11, *supra.*

that he was threatened with parole revocation, this Court has explained that " '[w]hen the representations of one in authority are calculated to foment hope or despair in the mind of the accused to any material degree, and a confession ensues, it cannot be deemed voluntary.' Syllabus, *State v. Parsons,* 108 W.Va. 705, 152 S.E. 745 (1930)[, *overruled, in part, by State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994)]." Syl. pt. 7, *Persinger,* 169 W.Va. 121, 286 S.E.2d 261. *But cf.* Syl. pt. 7, *State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994). ("Representations or promises made to a defendant by one in authority do not necessarily invalidate a subsequent confession. In determining the voluntariness of a confession, the trial court must assess the totality of all the surrounding circumstances. No one factor is determinative. To the extent that *State v. Parsons,* 108 W.Va. 705, 152 S.E. 745 (1930), is inconsistent with this standard, it is overruled.").

■ In the instant case, the trial court held a suppression hearing on August 21, 2007, pursuant to Mr. Black's counsel's motion to suppress his statements that he provided to the police. The motion to suppress included the tape-recorded statement, the handwritten statement, and the polygraph examination that Mr. Black participated in on January 29 and 30, 2007. Mr. Black, through counsel, alleged that the statements were taken in violation of his constitutional rights and were not voluntary statements. Mr. Black testified that he was induced or coerced into repeating information that was provided to him by officers, and that he did so in return for being allowed to go home and prevent revocation of his parole. The State responded that Mr. Black voluntarily came to the police station, was Mirandized, was told he was not under arrest, provided statements, was then permitted to leave, and was not arrested until several months later.

During the suppression hearing, the State called three police officers who testified to the events of the night when the statements were taken. The pertinent portions of Trooper Pack's testimony on direct examination by the State are as follows:

Q: When you went over Mr. Black's rights with him, was he handcuffed?

A. No, he was not.

Q. And did you tell him that he was free to leave?

A. Yes.

Q. And did he indicate that he understood that he was free to leave and not under arrest?

A. Yes. When I read the Miranda Rights form to him, I explained that all to him.

Q. Did he have any questions about them?

A. No.

Further, on cross-examination by defense counsel, the following exchange occurred:

Q. You knew he was on parole?

A. Yes.

Q. Okay. And you and he discussed that, didn't you?

A. I believe so.

. . . .

Q. And you indicated you would hate to see him get revoked?

A. I hate to see anybody get revoked. I don't know what you mean.

Q. I'm saying—and you discussed with him and you told him that you would hate to see him get revoked from parole?

A. Sir, if he's on parole, we discussed him being on parole. I can't recall saying I hope he doesn't get revoked.

After re-direct, and on subsequent re-cross-examination, the questioning continued as follows:

Q. The question was, he amended his statement to you after you and he had discussed parole, isn't that correct?

A. You got to understand, sir, if he's on parole, that's an issue for him from beginning to end. I understand that. So his issue of parole and whether he's revoked is not something that we can—it's a big elephant in the room. It's discussed. So did I sit there and say your parole is going to be revoked, this, that, and the other. I don't recall specifically saying that. But it was an issue for him, because he's on parole.

In addition to Trooper Pack's testimony, Sergeant Cummings testified that Mr. Black was free to leave at any time and was not under arrest. Moreover, he stated that he made no promises to Mr. Black in exchange for his statement, and that he did not remember discussing parole. The third officer, Corporal Parde, testified that Mr. Black was free to leave at any time and that no promises or threats were made to induce Mr. Black to provide a statement to the police.

Mr. Black also testified at the suppression hearing. He admitted that he was told he was not under arrest, that he was told he was free to leave, and that his *Miranda* rights were explained to him. He attested that, during the evening of his statements, the police officers told him the details of the crime, which he had no personal knowledge of prior to that time. He then agreed to take a polygraph test and became upset upon learning that he failed the test. Mr. Black testified that the polygraph examiner, Trooper Pack, then called him a liar and told him that he could lose everything, including his parole. The testimony at the suppression hearing continued with Mr. Black alleging that he simply wanted to go home and that he made up a story, which included the crime details that the officers had told him earlier, so that he could be finished and go home. The story, as allegedly concocted by Mr. Black, then became his written and recorded statements. As testified to by Mr. Black, he was then allowed to leave. He stated that he called the officers about a week later to recant his statement and that he still felt threatened with parole revocation.

At the conclusion of the suppression hearing, the trial court found that

[t]here is very ample evidence in the criteria of by a preponderance of the evidence as to admissibility that the statements given by Mr. Black were freely and voluntarily given. There is his testimony as to possible threats about revocation of

parole. His statements which differ greatly from the trooper's statements in regard to any coercion.... But there's really not much question in the Court's mind as to whether it's a custodial interrogation. I believe it was not.

There are matters of credibility that he can testify to the jury as to the admissibility—as to whether to believe it was a coerced or involuntary statement. But as far as the admissibility of the statement, the Court rules it is admissible[.]

In the instant matter, the determination of the voluntariness of Mr. Black's statements [14] relies on the discussion between the police officers and Mr. Black at the time that Mr. Black provided the statements. The trial court heard the testimony during a suppression hearing and did not believe any coercion was involved. This determination is supported by the testimony of the police officers, as well as Mr. Black's admission that he was told that he was not under arrest and that he was free to leave. In fact, Mr. Black did leave the police station at the conclusion of the statements and was not arrested until several months later. In view of these facts, the trial court did not err in finding Mr. Black's statements to be voluntary, and there was no abuse of discretion in the decision to admit Mr. Black's statements.[15]

### 2. *Exclusion of Expert Testimony*

◼ The second issue set forth by Mr. Black is that it was improper for the trial court to exclude his forensic psychiatrist's expert testimony, which would have consisted of general testimony regarding false confessions. The record indicates that the State made a motion to exclude the proffered expert, which was granted by the trial judge based on his finding that the testimony would be confusing to the jury and, further, that the subject matter of the testimony was unreliable. This Court's standard of reviewing such matters is well-settled: "[t]he admissi-

---

14. We refer to Mr. Black's factual accounts provided to the police on January 29 and 30, 2007, as "statements." As will be explained further in the next section of this opinion, *infra*, the trial judge determined that the statements were not confessions. We agree.

15. We note that the polygraph test and its results were not admitted at trial. *See* Syl. pt. 1, *State v. Chambers*, 194 W.Va. 1, 459 S.E.2d 112 (1995) ("'Polygraph test results are not admissible in evidence in a criminal trial in this State.' Syl. Pt. 2[.], *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979).").

bility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syl. pt. 6, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991).

■■■■■ Mr. Black argues that the testimony should have been allowed under Rule 702 of the West Virginia Rules of Evidence.[16] In that regard, we recognize that

> [p]ursuant to *West Virginia Rules of Evidence* 702 an expert's opinion is admissible if the basic methodology employed by the expert in arriving at his opinion is scientifically or technically valid and properly applied. The jury, and not the trial judge, determines the weight to be given to the expert's opinion.

Syl. pt. 4, *Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87 (1994). Further guidance is provided as follows:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

Syl. pt. 2, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993). Moreover,

> [t]he question of admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125

L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, [511] U.S. [1129], 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994) only arises if it is first established that the testimony deals with "scientific knowledge." "Scientific" implies a grounding in the methods and procedures of science while "knowledge" connotes more than subjective belief or unsupported speculation. In order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. It is the circuit court's responsibility initially to determine whether the expert's proposed testimony amounts to "scientific knowledge" and, in doing so, to analyze not what the experts say, but what basis they have for saying it.

Syl. pt. 6, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

■■■ In this case, Mr. Black's counsel notified the State of his intent to call psychiatrist Bobby Miller, M.D., as an expert witness on false confessions at trial. The defense specified that the proffered testimony would cover four points: (1) false confessions occur and are frequent; (2) persons with certain mental diseases or defects or personality structures are more prone to confess falsely; (3) false confessions have been studied in the psychiatric and related literature; and (4) forensic psychiatrists are often used to educate juries regarding false confessions. The State filed a motion to exclude the expert testimony, and the trial court conducted a hearing on the matter. In rendering its ruling, the trial court stated

> [t]his is not a confession that you're asking Dr. Miller to testify to. At the most it is a statement that may be slightly against the interest of the defendant. To allow him to testify about confessions in this matter would, I think, be very confusing to the jury.

---

**16.** Rule 702 of the West Virginia Rules of Evidence provides as follows:
  **Rule 702. Testimony by experts.**
  If scientific, technical, or other specialized knowledge will assist the trier of fact to under-

stand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Further, this testimony does not come up to any standards of reliability as far as scientific testing go[es], so the testimony of Dr. Miller will be excluded in this regard.

Thus, as it relates to Mr. Black, the trial court found that he did not confess to the crime, holding that "[a]t the most it is a statement that may be slightly against the interest of the defendant." We agree. A "confession" is defined as "[a] criminal suspect's oral or written acknowledgment of guilt, often including details about the crime." Black's Law Dictionary 338 (9th ed.2004). Further, "guilt" is defined as "[t]he fact or state of having committed a wrong, esp. a crime[.]" Black's Law Dictionary 776. Mr. Black gave both an oral and a written statement, wherein he stated that he drove a car containing the victim and three other individuals to an abandoned farm. He further stated that he stayed by the car while the other passengers went down a path. In the sense that there was never an acknowledgment of guilt or an admittance of participation in a crime, it was not a confession. Rather, it was a statement against his interests. Therefore, we agree with the trial court's assessment that expert testimony regarding false confessions would be confusing to the jury. Significantly, an evaluation of the larger factual presentation presents a greater concern. There is no evidence that the proposed expert had ever evaluated Mr. Black or that any of his testimony would be regarding Mr. Black specifically. The proffered testimony was only in the form of generalities and was never connected to the actual defendant on trial. Therefore, we agree with the trial court's determination that the expert testimony should be excluded.

In addition to the alleged violation of Rule 702, Mr. Black also argues that the exclusion of his expert's testimony denied him of his right to present a complete defense, which he alleges violated his constitutional rights and *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). We disagree.

In *Crane*, the defendant's murder conviction was reversed and remanded because error was found in the fact that the trial court excluded trial testimony regarding the circumstances of the defendant's confession on the ground that the testimony pertained solely to the issue of voluntariness, which had already been resolved against the defendant in a pretrial ruling. The United States Supreme Court found this exclusion deprived the defendant of a fair trial. However, the *Crane* case is inapplicable to the case presently pending before this Court. In Mr. Black's trial, the lower court excluded testimony of his proffered expert regarding general issues of false confession. However, unlike *Crane*, in Mr. Black's case, the lower court allowed testimony regarding the circumstances surrounding Mr. Black's statement to the police, including his allegations of coercion. Therefore, we do not agree that the trial court's exclusion of Mr. Black's proposed expert testimony violated either his constitutional rights or *Crane*. The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and we find that the trial court's exclusion of the testimony of Bobby Miller, M.D., was not clearly wrong.

### 3. Exclusion of Rebuttal Evidence

Third, Mr. Black contends that the trial court improperly excluded his proposed rebuttal testimony. Mr. Black intended to use the owner of a cab company to contradict the testimony of Brian Dement. The trial court excluded the proposed witness because the State was not provided any disclosure for this witness. In this regard, we have recognized that "'[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, 301 S.E.2d 596, 599 (1983)[, *overruled on other grounds by State v. Jenkins*, 191 W.Va. 87, 443 S.E.2d 244 (1994)]." Syl. pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983). More specifically, this Court has held that

"[t]he admissibility of evidence as rebuttal is within the sound discretion of the trial court, and the exercise of such discretion does not constitute ground for reversal unless it is prejudicial to the defendant." Syl. pt. 4, *State v. Blankenship*, 137 W.Va. 1, 69 S.E.2d 398 (1952), *overruled on other grounds, State v. McAboy*,

[160] W.Va. [497], 236 S.E.2d 431, 432 (1977)[, *overruled on other grounds by State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)].

Syl. pt. 4, *Peyatt*, 173 W.Va. 317, 315 S.E.2d 574.

■ Regarding the exclusion of witness testimony, this Court has recognized as follows:

Where a trial court is presented with a defendant's failure to disclose the identity of witnesses in compliance with West Virginia Rule of Criminal Procedure 16, the trial court must inquire into the reasons for the defendant's failure to comply with the discovery request. If the explanation offered indicates that the omission of the witness' identity was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it is consistent with the purposes of the compulsory process clause of the sixth amendment to the United States Constitution and article II, section 14 of the West Virginia Constitution to preclude the witness from testifying.

Syl. pt. 1, *State v. Ward*, 188 W.Va. 380, 424 S.E.2d 725 (1991).[17]

■ In the instant case, Brian Dement testified during Mr. Black's trial that he called a cab from a convenience store after running from the scene of the crime. Mr. Black's counsel sought to call as a witness the owner of the cab company. The proffered testimony was that the cab owner had a policy not to respond to calls for a cab in the specific vicinity due to high crime in the area. Mr. Black intended for the cab company owner's testimony to contradict the testimony of Brian Dement. The trial court excluded such witness testimony because the State was not provided any notice until the morning of the proposed testimony and it would have been an unfair surprise.

A review of the record reveals that both Mr. Black's counsel and the State filed recip-

rocal requests for discovery under Rule 16 of the West Virginia Rules of Criminal Procedure. It was conceded by Mr. Black's counsel, during the underlying trial, that he had Brian Dement's statements alluding to the use of a cab on the night in question. It was also conceded by Mr. Black's counsel that he did not disclose the name of the cab company owner as a possible witness. However, he stated that he was waiting to see what factual version Brian Dement would testify to at trial to determine if such testimony was needed.

Pursuant to the relevant portion of Rule 16,

(d)(2) Failure to comply with a request.—If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

At the time of the objection made by the State during trial, the judge inquired as to when Mr. Black's counsel was made aware of Brian Dement's testimony regarding his use of a cab on the night in question. The State proffered, and the defense conceded, that such information had been provided by the State to the defense in the discovery answers when the defense was provided with copies of Brian Dement's statements to the police. However, Mr. Black's counsel delayed until the day of trial, when the proposed witness would have testified, to even speak to the potential witness. Based on the fact that the defense had been aware of Brian Dement's statements regarding the use of a cab for months and that the defense had failed to investigate the matter until halfway through the second trial, the trial court excluded the

---

**17.** In *Ward*, the defendant appealed the lower court's refusal to permit testimony by the defendant's rebuttal witness. This Court upheld the exclusion based on both the defense counsel's failure to timely disclose the witness's name to the state and for violation of the court's order sequestering witnesses.

testimony. The trial court excluded the witness to prevent speculative testimony from the stand and to prevent unfair surprise to the State. We find no abuse of discretion with this determination.

#### 4. Exclusion of Witness Testimony of Jessica Carson

■ The next issue raised by Mr. Black on appeal is that the trial court erred in striking, as irrelevant, the testimony of Jessica Carson. As has previously been articulated in this opinion, " '[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk,* 171 W.Va. 639, 301 S.E.2d 596, 599 (1983)[, *overruled on other grounds by State v. Jenkins,* 191 W.Va. 87, 443 S.E.2d 244 (1994)]." Syl. pt. 2, *Peyatt,* 173 W.Va. 317, 315 S.E.2d 574.

The defense called Jessica Carson during the underlying trial. Her testimony consisted of accounts that she had a sexual relationship with a gentleman in a red truck who typically liked to choke her during sex. She stated that this relationship occurred in the area where the crime victim was found. Ms. Carson further averred that she saw a woman wearing a black tank top walking along the road and that a red truck pulled over to talk to the woman, which occurred a couple days prior to Ms. Carson learning through a news report that a dead body had been found on Hickory Ridge. After conclusion of her testimony, the State made a motion to strike the testimony, which was granted by the trial court on the ground that it was irrelevant. Mr. Black asserts that this testimony shows that there was another possible suspect for the commission of the crime; therefore, it should have been allowed.

■ Rule 402 of the West Virginia Rules of Evidence provides:

All relevant evidence is admissible, except as otherwise provided by the Consti-

tution of the United States, by the Constitution of the State of West Virginia, by these rules, or by other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible.

As this Court has illustrated, "Rules 402 and 403 of the *West Virginia Rules of Evidence* [1985] direct the trial judge to admit relevant evidence, but to exclude evidence whose probative value is substantially outweighed by the danger of unfair prejudice to the defendant." Syllabus Point 4, *Gable v. Kroger Co.,* 186 W.Va. 62, 410 S.E.2d 701 (1991).

■ Applying these principles to the present case, the lower court's evidentiary ruling was not an abuse of discretion because of the lack of credibility of the testimony. Even assuming, *arguendo,* that it was error to exclude Ms. Carson's testimony, it was harmless error.[18] There was sufficient testimony to show the victim in this case was alive while Mr. Black was with her, then immediately subsequent to that, Brian Dement found her dead. Therefore, we find that the exclusion of the testimony of Jessica Carson was not an abuse of discretion and, further, even if the exclusion was error, it was harmless error.

#### 5. Denial of Change of Venue

■ The fifth assignment of error asserted by Mr. Black is that it was error for the trial court to deny his motion for a change of venue. Regarding motions for change of venue, the law and standard of review is well-settled:

" ' "To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will

---

**18.** This Court succinctly explained that "where a nonconstitutional error has been asserted, we have adopted the rather general rule that the case will not be reversed unless the error is prejudicial to the defendant." *State v. Atkins,* 163 W.Va. 502, 510, 261 S.E.2d 55, 60 (1979) (citations omitted). *See also State v. Potter,* 197

W.Va. 734, 748, 478 S.E.2d 742, 756 (1996) ("Our cases consistently have held that nonconstitutional errors are harmless unless the reviewing court has grave doubt as to whether the [error] substantially swayed the verdict.") (citations omitted).

be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." Point 2, Syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).' Syllabus Point 1, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978)." Syl. pt. 1, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

Syl. pt. 6, *State v. Satterfield*, 193 W.Va. 503, 457 S.E.2d 440 (1995).

▉ As asserted in his motion for change of venue, Mr. Black contends that there was a hostile sentiment, which extended throughout the community; therefore, his change of venue should have been granted. In support of this motion, Mr. Black relied on the fact that his original trial began in February 2008 and ended in a mistrial when a witness mentioned Mr. Black's polygraph test. Mr. Black's counsel argued that the subsequent media coverage, which included three online news articles, from the mistrial tainted any future jury pool.

▉ However, we are reminded that

"[o]ne of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syl. pt. 3, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

Syl. pt. 8, *Satterfield*, 193 W.Va. 503, 457 S.E.2d 440. Before the second trial commenced against Mr. Black, the circuit judge questioned the jurors regarding their knowledge of the case. Two potential jurors were excused when they stated that they had read about the case in the local paper that morning. Two other jurors had seen or read something about the case but, upon further questioning, it was determined that they did not know about it in connection with Mr. Black, and, further, the court found, based upon their answers to questions, that they could be fair and impartial. The remaining members of the juror pool had no knowledge of the circumstances or the facts surrounding

the case. Thus, we agree with the circuit court that there was no showing of a pervasive sentiment in the community or with the members of the juror pool. The denial of the motion for change of venue was not an abuse of discretion.

### 6. State's Failure to Disclose Exculpatory Evidence

Next, Mr. Black argues that the State failed to disclose exculpatory evidence to him prior to trial. Mr. Black argues that, during Alicia Wibbling's trial testimony, she referenced that a guy had been at Punkin's house, crying in his beer about killing Deanna. Mr. Black argues that this was potentially exculpatory evidence that the State had a duty to provide him. In response, the State asserts that there was no violation or failure on the part of the State because Ms. Wibbling's trial testimony was the first instance that the State had ever heard of Punkin. Further, the State contends that the testimony was ambiguous and not exculpatory in any way.

▉ In making his arguments, Mr. Black relies on his assertion that the State has a duty to search out and learn of any and all exculpatory evidence known to it or to others acting on its behalf and to provide such information to the defendant at a reasonable time in advance of trial. In support of his claim, Mr. Black relies on the case of *Youngblood v. West Virginia*, 547 U.S. 867, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006). The United States Supreme Court, in *Youngblood*, held that the defendant's appeal presented a federal constitutional *Brady*[19] claim by alleging that a state trooper suppressed a note indicating that the defendant's sexual encounters with the victim were consensual, which warranted remand to allow the West Virginia Supreme Court of Appeals to address the *Brady* issue. We have explained that a claim of a violation of *Brady* presents "mixed questions of law and fact." *State v. Youngblood*, 221 W.Va. 20, 26, 650 S.E.2d 119, 125 (2007). Consequently, the " 'circuit court's factual findings should be reviewed under a clearly erroneous standard and ... questions of law are subject to *de novo* re-

19. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

view.' *State v. Kearns,* 210 W.Va. 167, 168–69, 556 S.E.2d 812, 813–14 (2001)." *State v. Hawk,* 222 W.Va. 248, 250, 664 S.E.2d 133, 135 (2008) (per curiam). As we have previously articulated, we now specifically hold that a claim of a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), presents mixed questions of law and fact. Consequently, the circuit court's factual findings should be reviewed under a clearly erroneous standard, and questions of law are subject to a *de novo* review.

■ On *Youngblood*'s remand to this Court, we held as follows:

There are three components of a constitutional due process violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982):(1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

Syl. pt. 2, *State v. Youngblood,* 221 W.Va. 20, 650 S.E.2d 119 (2007).

■ The evidence at issue was heard during the testimony of Ms. Alicia Wibbling, who was called by the State during its case-in-chief. There is no dispute that Ms. Wibbling was properly disclosed as a State witness as part of its discovery responses. At trial, during the State's first re-direct examination, the following exchange occurred:

Q. Now, [Mr. Black's defense counsel] asked you a few things we need to talk about.

A. Okay.

Q. Do you remember telling Sergeant Cummings a while ago and also you, Sergeant Cummings and I met over lunch, didn't we?

A. Yes.

Q. Just today?

A. Yes.

Q. Do you remember telling Sergeant Cummings back in February and us today that you remember when Deanna Crawford's body was found up on Hickory Ridge?

A. I remember it was in the summer.

Q. And do you remember telling us that you also remembered it, because you had just seen Deanna at a party at [Mr. Black's mother's house] just a few days before?

A. And I also said—

Q. Did you tell us that?

A. Yes. I also said that—that you asked me a question about me being at Punkin's house and the guy was crying in his beer about killing Deanna.

Q. Right. I asked you lots of different things. But you told me and Sergeant Cummings—you told him back in February and you told both of us just at noon that you remembered when Deanna's body was found. And part of what you remembered was you had just seen her at [Mr. Black's mother's] party a few days before that, didn't you?

A. Yes. I also said—

Q. Yes.

In reviewing the testimonial exchange adduced at trial, we are unable to discern exactly what Ms. Wibbling meant when she referred to "Punkin" and a "guy . . . crying in his beer about killing Deanna." Mr. Black has not presented any evidence to explain either the meaning or its relevancy. There is no manner in which we can determine who Punkin is, whether Punkin is Mr. Black, or even whether Punkin and the "guy crying in his beer" may be the same person. The record indicates that Mr. Black's counsel re-cross-examined the witness on two more occasions after the aforementioned testimony. Mr. Black's counsel did not seek to explore who Punkin was or who was crying in his beer on either occasion of re-cross-examination.

In absence of an understanding of the meaning of the testimony, there is no evidence to show that the testimony was either exculpatory or material to Mr. Black's case. Importantly, there is no evidence to suggest that the State knew the information prior to hearing it during Ms. Wibbling's testimony at trial; thus, the State did not inadvertently or

willfully suppress evidence in violation of *Brady*. Further, we do not agree with Mr. Black's interpretation of *Youngblood* as requiring the State to seek out everyone with even a tangential connection to a case. This assertion stretches *Youngblood*'s application to a nonsensical proportion. There was no violation of the State's duty to present exculpatory evidence.

### 7. Failure to Exclude State's Witnesses Showing Mr. Black's Presence at Crime Scene and to Exclude Witnesses Rebutting Alibi Defense

██ The seventh argument advanced by Mr. Black is that the State violated Rule 12.1 of the Rules of Criminal Procedure [20] because it did not properly disclose rebuttal witnesses and/or witnesses whose testimony placed the defendant at the scene of the crime. Mr. Black further contends that the State failed to notify him of the specific time and date of the commission of the alleged offense. Therefore, Mr. Black argues that all of the State's witnesses tending to show Mr. Black's presence at the crime scene should have been excluded, as well as all of the witnesses purporting to rebut Mr. Black's alibi defense. As has previously been articulated in this opinion, " '[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.'

*State v. Louk,* 171 W.Va. 639, 301 S.E.2d 596, 599 (1983)[, *overruled on other grounds by State v. Jenkins,* 191 W.Va. 87, 443 S.E.2d 244 (1994)]." Syl. pt. 2, *Peyatt,* 173 W.Va. 317, 315 S.E.2d 574.

Mr. Black contends that Brian Dement was the only witness upon whom the State relied to establish Mr. Black's presence at the scene of the crime. Mr. Black contends that he should have been excluded from testifying because the State failed to disclose him as a rebuttal witness. Further, Mr. Black argues that his alibi defense was hindered by the State's failure to accurately inform him of the date and time of the alleged offense of which he was charged. The indictment simply read that the offense occurred sometime "between August 4 and 8, 2002." Then, during opening statements at trial, the State indicated it intended to prove that the crime occurred on August 5, 2002. Because the defendant notified the State of his intent to use an alibi defense, Mr. Black argues it was incumbent on the State to tell him of the specific time and date of the offense. Mr. Black's arguments fail.

First, a review of the record reveals that Brain Dement was called during the State's case-in-chief. He was not a rebuttal witness. Moreover, Mr. Black was aware that the date set forth in the indictment was as practicable a time frame as possible given the decayed

---

**20.** The relevant portions of Rule 12.1 of the West Virginia Rules of Criminal Procedure provide as follows:

**Rule 12.1. Notice of alibi.**

(a) *Notice by defendant.*—Upon written demand of the attorney for the state stating the time, date and place at which the alleged offense was committed, the defendant shall serve within 10 days, or at such different time as the court may direct, upon the attorney for the state a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.

(b) *Disclosure of information and witness.*— Within 10 days thereafter, but in no event less than 10 days before trial, unless the court otherwise directs, the attorney for the state shall serve upon the defendant or the defendant's attorney a written notice stating the names and addresses of the witnesses upon

whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

(c) *Continuing duty to disclose.*—If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under subdivisions (a) or (b), the party shall promptly notify the other party or the other party's attorney of the existence and identity of such additional witness.

(d) *Failure to comply.*—Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of an undisclosed witness offered by such party as to the defendant's absence from or presence at the scene of the alleged offense. This rule shall not limit the right of the defendant to testify.

(e) *Exceptions.*—For good cause shown, the court may grant an exception to any of the requirements of subdivisions (a) through (d) of this rule.

state of the victim's body upon discovery and the inherent difficulties in affixing a time of death due to such decomposition. The defendant should not have been surprised that the State was going to use evidence to show he had a party at his house in August and that the crime occurred during a time when he had taken the victim on a car ride away from his home. The evidence was the same from the inception of this case, plus Mr. Black had been through a previous trial that had ended in a mistrial. There was no surprise evidence used.

■ Second, even if there was a violation of Rule 12.1 of the Criminal Procedure Rules, such rule is a permissive rule. Subsection (d) states that if any party fails to comply with the rule, "the court *may* exclude the testimony of an undisclosed witness offered by such party as to the defendant's absence from or presence at the scene of the alleged offense." (Emphasis added). Further, subsection (e) provides that, "[f]or good cause shown, the court *may* grant an exception to any of the requirements of subdivisions (a) through (d)[.]" (Emphasis added). Moreover, this Court has previously found that, "[s]ubject to certain exceptions, pretrial discovery in a criminal case is within the sound discretion of the trial court." Syl. pt. 8, *State v. Audia,* 171 W.Va. 568, 301 S.E.2d 199 (1983). Thus, even assuming a violation, Rule 12.1 is a permissive rule, and the trial court did not abuse its discretion in making its determination under the facts of this case where no unfair surprise was shown.

### 8. *State's Remarks During Closing Arguments*

■ The final assignment of error set forth by Mr. Black is that the trial court erred in allowing the State, during its closing arguments, to make references to inadmissible out-of-court statements. The State responds that there was no error because the statements in question were part of an audio-recorded statement played by the defense for the jury to impeach Brian Dement during his testimony. Our standard of review has been determined as follows:

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *Vance,* 207 W.Va. 640, 535 S.E.2d 484. Further,

[f]our factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. pt. 6, *State v. Sugg,* 193 W.Va. 388, 456 S.E.2d 469 (1995).

Brian Dement was recorded in his home, without his knowledge, by his uncle, Greg Bailey, at the request of law enforcement. Mr. Black's petition for appeal represents that, during a suppression hearing on August 21, 2002, in Brian Dement's case, the trial judge ruled that "I will suppress any statements made by—without the consent of the defendant in his residence or place where he was riding by an undercover or confidential person without his knowledge. In other words, Mullens situation." During closing arguments of Mr. Black's trial, the following exchange occurred:

State: But the other thing to keep in mind is the reason why they [the police] came to Brian Dement was [sic] because Brian Dement had already been telling his uncle, Greg Bailey, about his involve[ment] in that matter.

Defense: Objection, Your Honor.

Court: Sustained.

State: It's in the statement. It's in the statement played for the jury.

Court: The correct thing is the—the jury will recall.

State: It's in the statement.

Court: Will recall whichever.

Defense: Which is not in evidence, Your Honor.

Court: One, don't argue. Will recall how the testimony is.

State: The same statement that they want you to rely on to show why Brian Dement's lying and not to be believed, in that statement to Mr. Cook, he said—

Defense: Objection. If he's going to make a reference to that, he can't.

Court: Overruled.

Defense: Your Honor, it was redacted.

Court: Overruled. One minute added on.

Mr. Black relies on the cases of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *State v. Mullens*, 221 W.Va. 70, 650 S.E.2d 169 (2007), to support his argument. The *Crawford* Court determined that out-of-court testimonial statements by witnesses are barred, under the Confrontation Clause, unless the witnesses are unavailable and the defendant had a prior opportunity to cross-examine the witnesses, regardless of whether such statements are deemed reliable by the court. In *Mullens*, this Court determined that the search and seizure provision of the West Virginia State Constitution prohibits the police from sending an informant into the home of another person under the auspices of the one-party consent to electronic surveillance provisions of the West Virginia Wiretapping and Electronic Surveillance Act where the police have not obtained prior authorization to do so. Neither case is applicable to the specific assignment of error presently before this Court. Neither *Mullens* nor *Crawford* extends to a passing reference made by the State during closing remarks. Further, there is no testimonial, out-of-court, statement from an unavailable witness. In this case, Brian Dement did testify and was subject to cross-examination.

Mr. Black argues that the statement referred to by the State was redacted from the evidence played for the jury. The State, conversely, argues that the statement was included in a defense exhibit and was not redacted. A review of the remarks made during closing arguments leads this Court to the conclusion that the remarks were not intended to mislead the jury or prejudice the accused. They were mentioned in an isolated fashion. Further, even removing the complained-of reference, there still remains competent proof to establish the guilt of the accused. Significantly, in light of the dispute regarding whether the reference was redacted or actually played for the jury by the defense, the State did not deliberately try to place the statements before the jury to divert attention to extraneous matters. Therefore, we find no error in the lower court's rulings.

## IV.

### CONCLUSION

In view of the foregoing, we affirm the judgment convicting and sentencing Mr. Black for the crime set out herein.

Affirmed.