# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**September 2022 Term**

_____

**No. 20-0744**

_____

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent,**

**V.**

**A.B.,**
**Defendant Below, Petitioner.**

_____

**Appeal from the Circuit Court of Raleigh County**
**The Honorable Robert A. Burnside, Jr., Judge**
**Criminal Action No. 16-F-429**

**AFFIRMED**

_____

**Submitted: September 14, 2022**
**Filed: November 17, 2022**

Matthew Brummond, Esq.
Public Defender Services
Appellate Advocacy Division
Charleston, West Virginia
Attorney for the Petitioner

Patrick Morrissey, Esq.
Attorney General
Andrea Nease Proper, Esq.
Lara K. Bissett, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Respondent

JUSTICE BUNN delivered the Opinion of the Court.

CHIEF JUSTICE HUTCHISON and JUSTICE WOOTON dissent and reserve the right to file dissenting opinions.

**SYLLABUS BY THE COURT**

1.    "A claim of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), presents mixed questions of law and fact. Consequently, the circuit court's factual findings should be reviewed under a clearly erroneous standard, and questions of law are subject to a *de novo* review." Syllabus point 7, *State v. Black*, 227 W. Va. 297, 708 S.E.2d 491 (2010).

2.    "Where a constitutional right to counsel exists under W. Va. Const. art. III, § 14, there is a correlative right to representation that is free from conflicts of interest." Syllabus point 2, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599 (1988).

3.    "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syllabus point 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

4.      When constitutional claims of ineffective assistance of counsel based upon successive representation are raised, the individual claiming ineffective assistance of counsel must demonstrate actual prejudice—that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different—pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

5.      "There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial." Syllabus point 2, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007).

**Bunn, Justice:**

Petitioner A.B.[1] appeals the September 22, 2020 order of the Circuit Court of Raleigh County resentencing her, for the purpose of appeal, to an aggregate term of incarceration of five to twenty-five years for her convictions of one count of child neglect resulting in death and two counts of gross child neglect creating a risk of substantial injury or death. On appeal, A.B. advances two grounds for reversal of her convictions. Her primary contention is that the circuit court violated her Sixth Amendment right to conflict-free counsel. A.B. next claims that the State violated *Brady v. Maryland*[2] and *State v. Youngblood*[3] by failing to disclose certain records involving a central witness. For the reasons set forth below, we affirm.

---

[1] Consistent with our long-standing practice in cases involving infants or sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 256 n.1, 773 S.E.2d 20, 22 n.1 (2015). *See also* W. Va. R. App. P. 40(e) (restricting use of personal identifiers in cases involving children).

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[3] *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007).

# I.

## FACTUAL AND PROCEDURAL HISTORY

This case involves a tragic incident that occurred on November 7, 2015. After drinking heavily, A.B. fell asleep and rolled over on her five-month-old daughter, G.B., who died by asphyxiation. In September 2016, a Raleigh County grand jury indicted A.B. on three counts: (1) child neglect resulting in the death of G.B. in violation of West Virginia Code § 61-8D-4a; (2) child neglect with risk of serious bodily injury or death of D.B., age four, in violation of West Virginia Code § 61-8D-4(c); and (3) child neglect with risk of serious bodily injury or death of J.B., age two, in violation of West Virginia Code § 61-8D-4(c).[4]

The State agreed to provide open file discovery that "shall remain continuous and shall occur within the time frames prescribed" by the orders and rules of the circuit court. In October 2016, A.B. filed an omnibus discovery motion requesting, among other items, all documents and tangible objects in the "possession, custody, and control[,] of the State, and which are material to the preparation of his [sic] defense or are intended for use by the State as evidence in chief at the trial, or were obtained from or belonged to the defendant." This request included (1) all documents relating to any criminal conviction of any State witness; (2) any exculpatory and/or impeachment material; (3) any juvenile and

---

[4] D.B. and J.B. are siblings of G.B.

criminal records of any State witness; and (4) any medical/psychiatric condition of any State witness.

Throughout the proceedings, several attorneys represented A.B.[5] On February 10, 2020, fourteen days before her trial, A.B.'s then-current counsel, Sarah Smith, from the Public Defender Corporation ("PDC"), filed a motion to withdraw as counsel.[6] In the one-paragraph motion, Ms. Smith asserted that she discovered only days earlier that a State witness, K.S., had previously been the subject of a juvenile petition and had been represented by another lawyer who worked in the same PDC office.[7]

---

[5] It appears from the record that A.B. was originally represented by the Public Defender Corporation ("PDC"). At that time, Sarah Smith was employed with the PDC and represented A.B. Ms. Smith eventually left the PDC to work for Robert Dunlap of Robert Dunlap & Associates. At some point during the proceedings, in 2017, A.B. changed her representation to Robert Dunlap & Associates with Mr. Dunlap and Ms. Smith. Ms. Smith subsequently left Mr. Dunlap's office to return to her previous employment at the PDC. Mr. Dunlap filed a motion to withdraw as counsel and in June 2019 the circuit court held a hearing on the motion. During the hearing, Mr. Dunlap explained that when his office began its representation of A.B., she initially met with and established a relationship and level of comfort with Ms. Smith and that Ms. Smith had returned to her previous employment at the PDC. A.B. did not form the same bond with Mr. Dunlap. The circuit court granted Mr. Dunlap's motion to withdraw, and A.B. then returned to the PDC for representation.

[6] While the motion was based on two juvenile witnesses, K.S. and M.S., in the proceeding below, the State did not call M.S. as a witness. A.B. does not allege any error relating to M.S. in this appeal.

[7] Rule 1.10 of the West Virginia Rule of Professional Conduct sets forth the general rule regarding imputation of conflicts of interest and Rule 1.11 of the West Virginia Rules of Professional Conduct describes special conflicts of interest rules for former and current government officers and employees.

3

At a pretrial hearing on February 19, 2020, the court heard arguments on Ms. Smith's motion to withdraw. Ms. Smith advised the court that a few weeks prior, she received a witness list from the State and upon cross-referencing that witness list with the PDC's client files, she discovered that K.S. had been a client on an unrelated matter.[8] Ms. Smith further indicated that she reviewed K.S.'s files and gained information that she would not have had but for K.S.'s representation by her office.[9] Without disclosing the exact information, Ms. Smith represented to the court she would have an obligation to use that information she learned when she cross-examined K.S. and an "adult guardian." She vaguely stated that the records "would call into question" K.S.'s conduct and "that sort of thing."

The State objected to Ms. Smith's motion to withdraw asserting that Ms. Smith had the full name of K.S. as a potential witness since at least 2015, including when she returned to the PDC in April 2019, and should have recognized the potential conflict

---

[8] It appears from the record before us that at the time Ms. Smith determined K.S. had been a client of the PDC, the matters involving K.S. were concluded and not currently pending. From at least September 2016 to July 2017, it appears that A.B. was represented by the PDC. Then, A.B. hired Dunlap & Associates as her counsel from July 2017 to June 2019 when Mr. Dunlap withdrew as counsel. It was during this time that the PDC represented K.S. in her juvenile proceeding. In particular, the proceeding was initiated in November 2017 and was dismissed in February 2019, almost a year before Ms. Smith filed her motion to withdraw. There was no overlap in the PDC's representation of A.B. and K.S.

[9] Ms. Smith informed the court that she spoke to the Office of Disciplinary Counsel and had been "advised that *concurrent* representation is not possible." (Emphasis added).

4

earlier. After hearing the respective arguments of counsel and reviewing the State's records regarding K.S.'s juvenile proceedings,[10] the circuit court denied Ms. Smith's motion to withdraw. The court conditioned its denial by stating that if Ms. Smith discovered any other reason for her withdrawal, she would have the opportunity to supplement her motion. At the conclusion of the pretrial hearing, the State asked the court to require Ms. Smith to submit any intended cross-examination of K.S. to an in camera review, for confidentiality purposes, before she questioned K.S. in the jury's presence. The court responded that it assumed this issue "would be taken up . . . during trial when we reach that point[.]" Ms. Smith consented to the proposed process.

A.B.'s trial commenced on February 24, 2020. The State presented testimony from several witnesses, including emergency responders, investigating law enforcement officers, medical providers, medical experts, and family members who lived in the same home as A.B. at the time of the incident. Relevant to this appeal is the following testimony. First, K.S., who provided approximately two-and-a-half pages of testimony, stated that she was G.B.'s cousin. K.S. and A.B. resided in the same house but on different floors. On November 7, 2015, when she was twelve years old, K.S. walked into A.B.'s living space and found A.B. lying on top of G.B. Because K.S. was unable to free the infant or awaken A.B., K.S. called for her grandmother's assistance.

---

[10] Ms. Smith did not produce any records during the hearing, either in camera or under seal.

Before Ms. Smith cross-examined K.S., the circuit court held an in camera hearing regarding the matters Ms. Smith intended to explore during cross-examination, including truancy, marijuana and alcohol use, and certain psychological records. Ms. Smith, who had the records due to the PDC's previous representation of K.S., acknowledged that the juvenile proceedings were initiated in 2017 and that the records did not disclose exactly when the marijuana and alcohol use began. She indicated that this information was relevant because if K.S. abused these substances at the time of the incident, she may have misremembered the events. The State submitted that to establish a foundation Ms. Smith need only ask K.S. one question in camera: "'Were you under the influence of alcohol or drugs at the time of [G.B.]'s death?'" The court asked Ms. Smith if she had any objection to the "proposed limitation on the scope of cross-examination and the use of these records" to which Ms. Smith replied that she did not. Ms. Smith asked K.S. the following question: "[K.S.], on November 7th of 2015, had you used any alcohol or drugs?" K.S. replied, "No." Ms. Smith further clarified the question by asking if K.S. had used any alcohol or drugs on the day in question or the day prior. K.S. again replied "No." Based on K.S.'s response, Ms. Smith stated that she did not believe K.S.'s truancy-related issues, her psychological report, or her use of marijuana or alcohol would be admissible. Following the conclusion of the in camera hearing, Ms. Smith confirmed, in the jury's presence, that she would not cross-examine K.S.

Next, the grandmother to both G.B. and K.S., ("Grandmother")[11] provided approximately fourteen pages of direct and redirect testimony regarding how she found G.B. in A.B.'s room, the deplorable condition of the room, and A.B.'s altered state of mind on the day G.B. died.[12] On November 7, 2015, K.S. came downstairs and told her that A.B. "was on the baby and the baby wasn't moving." Grandmother "ran up[stairs] [] to see what was going on and found [A.B.] on the baby and pulled the baby out[.]" She then brought G.B. downstairs where Grandmother's husband began giving the infant CPR while K.S. called 911. Grandmother returned upstairs and found A.B. unresponsive. She described the condition of the room as "horrible;" there was "trash and junk everywhere." Grandmother noticed empty alcohol bottles in the room. When the emergency responders arrived, A.B. was not coherent and she never expressed any concern regarding the welfare of G.B.

Following Grandmother's testimony, several law enforcement officers testified. Corporal Timothy Hughes ("Cpl. Hughes") testified as follows. When he arrived at Raleigh General Hospital, Cpl. Hughes made several general observations regarding A.B.: (1) a "strong odor of alcohol" came from A.B.'s hospital room and (2) she "seemed incoherent and disoriented." Continuing his investigation, Cpl. Hughes went to Grandmother's home to view the scene of the incident. He went upstairs and saw the

---

[11] For clarity, we refer to her as "Grandmother" because she shares the same initials as G.B.

[12] Grandmother had allowed her daughter-in-law, A.B.; her son, A.B.'s husband; and their three children to live in her home on and off for three years.

"debris and trash[.]" Corporal Hughes could not see the bottom of the floor, "[i]t was just filled with trash and soiled clothing and rotting food and milk containers and soda cans[;]" "[i]t was generally unlivable." By the bed, Cpl. Hughes found "molded food and trash and alcohol bottles and cigarette butts."

Sergeant Morgan Bragg also investigated G.B.'s death and took approximately 130 photographs during his investigation, many of which were admitted into evidence during trial. These pictures captured the appalling living conditions in A.B.'s room, including a bottle of vodka that A.B. admitted to drinking on the day G.B. asphyxiated. He described the significant number and types of alcohol bottles recovered from A.B.'s room.

Furthermore, several emergency response providers offered the following testimony. Anthony Wilcox stated that upon his arrival he noticed that rigor mortis had already set in on G.B. and that in his experience, rigor mortis generally takes several hours after death before setting in. A second emergency provider, Richard Garten ("Mr. Garten"), medically assessed A.B. His primary impression was "[a]lcohol abuse" and secondary impression was "slurred speech." Mr. Garten noticed "a lot of different sizes of different types of alcohol [bottles]." A.B. admitted to him "that she had been drinking numerous alcoholic beverages starting [in the] morning and even stated she had a drink just five minutes prior to EMS arrival for her." She did not show any signs of distress other than her intoxication.

8

Finally, various medical professionals testified on behalf of the State. On November 7, 2015, Hannibal Mahdi, M.D. ("Dr. Mahdi") provided medical care and treatment to A.B. at Raleigh General Hospital. After examining A.B., Dr. Mahdi diagnosed A.B. with "alcoholic intoxication." She completed a drug screen, which was negative, but A.B.'s alcohol level was 0.289, which Dr. Mahdi described as "high."[13] Dr. Mahdi completed a thorough examination to rule out any other medical issue relating to A.B.'s altered mental state. Can Metin Savasman, M.D. performed the autopsy of G.B. and stated that her cause of death was "asphyxia due to having been overlain during sleep."

John Patrick Fernald, M.D. ("Dr. Fernald") offered expert testimony regarding the dangers of an intoxicated adult sleeping in bed with an infant. He further discussed A.B.'s living conditions and the harm that can come to a child living in those circumstances. Specifically, Dr. Fernald stated that "[t]hese [were] the worst living conditions for a child I have witnessed in 19 years of practicing medicine, including several years overseas in third world countries."

A.B.'s only witness during trial was her husband. He testified that he was not certain if A.B. had been drinking on the day in question, but that they both had been

---

[13] For reference, pursuant to this State's motor vehicle laws, an "impaired state" is defined as, among others, "hav[ing] an alcohol concentration in his or her blood of eight hundredths of one percent or more [0.08%], by weight." W. Va. Code § 17C-5-2.

drinking together the day before. Her husband indicated that A.B. was not an everyday drinker. However, the State's extensive cross-examination demonstrated a string of inconsistent statements.

The jury convicted A.B. on all three counts. The circuit court held a sentencing hearing on July 16, 2020 and sentenced A.B. to consecutive terms of not less than three nor more than fifteen years in prison for child neglect resulting in the death of G.B.; not less than one nor more than five years in prison for child neglect with risk of serious bodily injury or death regarding D.B.; and not less than one nor more than five years in prison for child neglect with risk of serious bodily injury or death regarding J.B. On September 22, 2020, the circuit court entered an order resentencing A.B. for purposes of appeal. This appeal followed.

On appeal, A.B. filed her brief alleging a violation of her Sixth Amendment right to conflict-free counsel and the State responded. We heard oral arguments on January 12, 2022. Subsequently, this Court directed the parties to provide supplemental briefing to address any potential *Brady* violations as defined by Syllabus point 2 of *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007). Following the filing of the supplemental briefs, and the presentation of supplemental oral argument, this case was submitted for decision.

## II.

## STANDARD OF REVIEW

A.B. first claims that she was denied her Sixth Amendment right to conflict-free counsel when the circuit court denied her counsel's motion to withdraw due to a conflict of interest. In *State ex rel. Blake v. Hatcher*, 218 W. Va. 407, 624 S.E.2d 844 (2005), we stated that:

> the United States Supreme Court found the trial court should be afforded considerable latitude in making its determination to disqualify a criminal defense attorney due to a conflict of interest. *Wheat* [*v. United States*], 486 U.S. [153,] at 1630-64, 108 S. Ct. [1692,] at 1699-1700 [100 L.Ed.2d 140 (1988)]. Recognizing the trial court's need for latitude, several courts have applied an abuse of discretion standard when reviewing decisions on disqualification motions. We agree that this is the appropriate standard of review.

*Blake*, 218 W. Va. at 417-18, 624 S.E.2d at 854-55 (citations omitted). *Accord State v. Rogers*, 231 W. Va. 205, 214, 744 S.E.2d 315, 324 (2013) (per curiam). Additionally, while A.B. is challenging the circuit court's decision denying her counsel's motion to withdraw, she is essentially claiming that due to the circuit court's decision, she received ineffective assistance of counsel due to a conflict of interest.[14] We have stated that

---

[14] "Conflict-of-interest claims involving attorneys in criminal cases are a species of ineffective assistance of counsel under the Sixth Amendment." *Galloway v. State*, 298 So. 3d 966, 974-75 (Miss. 2020). We have repeatedly warned that "it is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied." Syl. pt. 10, in part, *State v. Triplett*, 187 W. Va. 760, 421 S.E.2d 511 (1992). However, under the specific facts of this matter, we will review A.B.'s assignment of error. *See State v. Rogers*, 231 W. Va. 205, 212, 744 S.E.2d 315, 322 (2013) (per curiam) (reviewing a claim on direct

11

[a]n ineffective assistance of counsel claim presents a mixed question of law and fact; we review the circuit court's findings of historical fact for clear error and its legal conclusions *de novo*. This means that we review the ultimate legal claim of ineffective assistance of counsel *de novo* and the circuit court's findings of underlying predicate facts more deferentially.

*State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 320, 465 S.E.2d 416, 422 (1995).

Next, A.B. asserts that the State withheld certain documents relating to a witness in violation of *Brady* and *Youngblood*. This Court has established that "[a] claim of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), presents mixed questions of law and fact. Consequently, the circuit court's factual findings should be reviewed under a clearly erroneous standard, and questions of law are subject to a *de novo* review." Syl. pt. 7, *State v. Black*, 227 W. Va. 297, 708 S.E.2d 491 (2010). With these standards in mind, we now consider the parties' arguments.

## III.

## DISCUSSION

We will address A.B.'s two assignments of error in turn.

---

appeal that a circuit court violated a petitioner's due process rights when it refused to grant his trial counsel's motion to withdraw based on a conflict of interest). *Accord State v. Kirk N.*, 214 W. Va. 730, 736, 591 S.E.2d 288, 294 (2003).

### A. Conflict-free Counsel

A.B. contends that the circuit court violated her Sixth Amendment right to conflict-free counsel when her attorney was unable to both zealously advocate for her and protect the confidences of the State's witness, K.S. On the other hand, the State maintains that no actual conflict existed that adversely affected Ms. Smith's representation of A.B. We find no error.

This Court has reiterated that "[t]he Sixth Amendment to the United States Constitution and article III, § 14 of the West Virginia Constitution guarantee a criminal defendant the right to the assistance of counsel." *State ex rel. Yurish v. Faircloth*, 243 W. Va. 537, 543, 847 S.E.2d 810, 816 (2020). This right to counsel includes "the right to effective assistance of counsel." Syl. pt. 1, in part, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599 (1988). *See also Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063, 80 L. Ed. 2d 674 (1984). We have further held that "[w]here a constitutional right to counsel exists under W. Va. Const. art. III, § 14, there is a correlative right to representation that is free from conflicts of interest." Syl. pt. 2, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599.

Conflict of interest claims involving attorneys in criminal matters are a type of ineffective assistance of counsel pursuant to the Sixth Amendment. We note that federal courts have employed different tests for Sixth Amendment violations and assessing their prejudicial impact, depending on the type of Sixth Amendment violation alleged.

13

Ineffective assistance of counsel claims are generally analyzed under the *Strickland* standard.[15] Pursuant to *Strickland*, a petitioner must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *See generally Strickland*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. This Court has previously adopted the *Strickland* test when considering ineffective assistance of counsel claims:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

But when a petitioner alleges ineffective assistance based on a conflict of interest, a less demanding standard *may* apply, making it easier to show ineffective assistance of counsel. The United States Supreme Court has carved out at least two

---

[15] The United States Supreme Court has stated that "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance to counsel." *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988, 993, 89 L. Ed. 2d 123 (1986). On appeal, A.B. asserts that the circuit court forced her trial counsel, Ms. Smith, to violate Rules 1.7 (Conflict of Interest; Current Clients), 1.9 (Duties to Former Clients), and 1.10 (Imputation of Conflicts of Interest: General Rule) of the West Virginia Rules of Professional Conduct when it denied Ms. Smith's motion to withdraw as counsel. For the reasons stated herein, we need not reach a conclusion as to whether any of these Rules were violated.

exceptions to *Strickland*. First, in *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978), the Supreme Court established a very narrow exception that "whenever a trial court *improperly requires joint representation* over timely objection reversal is automatic." 435 U.S. at 488, 98 S. Ct. at 1181 (emphasis added).

Two years later, the Supreme Court created another limited exception to the general *Strickland* standard for ineffective assistance of counsel claims in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). In *Sullivan*, the Supreme Court distinguished *Holloway* and found that "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry [to determine if a conflict of interest exists]." *Id.* at 347, 100 S. Ct. at 1717. Furthermore, *Sullivan* found that prejudice will not be presumed, and the automatic reversal rule will not apply; rather, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348, 100 S. Ct. at 1718. Importantly, although *Sullivan* did not involve jointly represented co-defendants, it did include multiple concurrent representation of a single attorney of co-defendants in separate trials. *Id.* at 340, 100 S. Ct. at 1713-14. As the United States Court of Appeals for the Tenth Circuit explained,

> [r]ead together, these cases establish a bifurcated standard for addressing conflict of interest claims in the *multiple representation* context. First, if the defendant objects to the alleged conflict prior to trial, prejudice is presumed if the trial court failed to inquire into the nature and scope of the conflict

15

> and required the defendant to proceed with the same attorney. In such instances, reversal is automatic. . . . But if the defendant does not object to the alleged conflict at trial, he must demonstrate on appeal that an actual conflict adversely affected his representation. Only if the defendant's demonstration is sufficient is prejudice presumed. . . . If the defendant's demonstration is insufficient, then traditional *Strickland* review will apply[.]

*United States v. Williamson*, 859 F.3d 843, 853 (emphasis added). The import from both *Holloway* and *Sullivan* is that both involve joint or multiple *concurrent* representation and were concerned with the potential inherent dangers of such representation and the difficulty in determining prejudice in those circumstances.

Following *Sullivan*, the Supreme Court elaborated on its previous exceptions to the general *Strickland* standard in *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). In *Mickens*, the question presented was "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known." *Mickens*, 535 U.S. at 164, 122 S. Ct. at 1239. Even though the case involved successive representation,[16] the parties "presented and argued [to the Supreme Court] on the assumption that (absent some exception for failure to inquire) *Sullivan* would be

---

[16] Mr. Mickens' counsel had been representing the victim in the matter on assault and concealed weapons charges at the time of the murder. *Mickens v. Taylor*, 535 U.S. 162, 164, 122 S. Ct. 1237, 1240, 152 L. Ed. 2d 291 (2002). Upon the victims' murder, the pending charges against him were dismissed. *Id.* at 164-65, 122 S. Ct. at 1240. Days later, the same counsel was appointed to Mr. Mickens. *Id.* at 165, 122 S. Ct. at 1240.

16

applicable—requiring a showing of defective performance, but not requiring in addition (as *Strickland* does in other ineffectiveness-of-counsel cases), a showing of probable effect upon the outcome of trial." *Id.* at 174, 122 S. Ct. at 1245. The Supreme Court stated that this "assumption was not unreasonable in light of the holdings of Courts of Appeals, which have applied *Sullivan* unblinkingly to all kinds of alleged attorney ethical conflicts[.]" *Id.* at 174-75, 122 S. Ct. at 1245 (quotations and citations omitted). The types of conflicts that the lower courts had "unblinkingly" applied *Sullivan* to included not only alleged obligations to former clients, but also circumstances where the "representation of the defendant somehow implicates counsel's personal or financial interests . . . or fear of antagonizing the trial judge[.]" *Id.* at 174-75, 122 S. Ct. at 1245 (internal quotations and citations omitted).

In *Mickens*, the Supreme Court cautioned "[i]t must be said, however, that the language of *Sullivan* itself does not clearly establish, or *indeed even support*, such expansive application." *Id.* at 175, 122 S. Ct. at 1245 (emphasis added). Significantly,

> [b]oth *Sullivan* itself, . . . and *Holloway*, . . . stressed the high probability of prejudice arising from *multiple concurrent representation*, and the difficulty of proving that prejudice. . . . [T]he Federal Rules of Criminal Procedure treat concurrent representation and prior representation differently, requiring a trial court to inquire into the likelihood of conflict whenever jointly charged defendants are represented by a single attorney (Rule 44(c)), but not when counsel previously represented another defendant in a substantially related matter, even where the trial court is aware of the prior representation.

17

*Id.* (internal citations omitted) (emphasis added). The *Mickens* Court left open the question

of whether *Holloway* or *Sullivan* would apply to instances of successive representation as

follows:

> This is not to suggest that one ethical duty is more or less important than another. The purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland*, however, is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel. . . . *In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the* Sullivan *prophylaxis in cases of successive representation. Whether* Sullivan *should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question.*

*Id.* at 176, 122 S. Ct. at 1246 (emphasis added) (citations omitted).

In the case sub judice, while both parties apply the *Sullivan* test,[17] we find

that this analysis is not appropriate under the facts of this case which involve successive,

rather than joint or multiple concurrent representation.[18] A.B. and K.S. were not jointly

---

[17] We recognize that like the matter before us, despite the representation being successive rather than concurrent, the parties and the Supreme Court in *Mickens* utilized the *Sullivan* framework. We decline to follow suit here as it is important to clarify our law following *Mickens*.

[18] The United States Court of Appeals for the Sixth Circuit explained the difference between joint and multiple representation in *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004). The court defined "joint and dual representation" as "simultaneous representation occurring in the same proceeding, while multiple representation refers to simultaneous representation in separate proceedings." *Id.* at 701. The Sixth Circuit further defined successive representation in *Jalowiec v. Bradshaw*, 657 F.3d 293 (6th Cir. 2011) as a situation "where defense counsel has previously represented a co-defendant or trial

18

represented by the PDC (or the same attorney) in the same proceeding nor does the record demonstrate that the PDC represented A.B. and K.S. at the same time in separate proceedings; rather Ms. Smith represented A.B. during this criminal proceeding, and a different attorney from the PDC represented K.S. in an earlier, unrelated juvenile proceeding.[19] Consequently, this matter involves successive representation.

As discussed above, the Supreme Court has not definitively held that the *Holloway* or *Sullivan* test is applicable to instances of successive representation. Further, while we have addressed ineffective assistance of counsel claims in the context of a conflict of interest, we have not directly addressed how *Mickens* affects our law.[20] As such, we examine other jurisdictions and lower federal courts for guidance post-*Mickens*.

---

witness," while concurrent representation "occurs where a single attorney simultaneously represents two or more codefendants." *Id.* at 315.

[19] *See, supra*, note 8 for a discussion of the relevant timeframes.

[20] Shortly after *Sullivan* was decided we acknowledged it and held that "[i]n *a case of joint representation*, once an actual conflict is found which affects the adequacy of representation, ineffective assistance of counsel is deemed to occur and the defendant need not demonstrate prejudice." Syl. pt. 4, *Cole v. White*, 180 W. Va. 393, 376 S.E.2d 599 (1988) (emphasis added). As *Cole* concerned matters of joint representation, it is not applicable to the case before us, and nothing in this opinion should be construed as modifying *Cole*.

Subsequently, in *State ex rel. Blake v. Hatcher*, 218 W. Va. 407, 413-14, 624 S.E.2d 844, 850-51 (2005), this Court explained that "[w]here representation is affected by an actual conflict of interest, the defendant can not be said to have received effective assistance of counsel as required by the Sixth Amendment." Importantly, while this Court created several syllabus points in *Blake*, this principle was not one. *See* Syl. pt. 1, *State v. McKinley*, 234 W. Va. 143, 764 S.E.2d 303 (2014) ("Signed opinions containing original syllabus points have the highest precedential value because the Court uses original syllabus

The Supreme Court of Kentucky reviews successive conflicts of interest under the *Strickland* standard. *See Steward v. Commonwealth*, 397 S.W.3d 881, 883 (Ky. 2012). *See also Jones v. Commonwealth*, 641 S.W.3d 162, 167 (Ky. 2022) ("We review successive conflicts of interest under the *Strickland* standard."). The *Steward* Court explained that while the United States Supreme Court in *Mickens* "recogniz[ed] the high probability of prejudice arising from joint representation cases, [it] acknowledged that not all attorney conflicts present comparable difficulties." *Steward*, 397 S.W.3d at 883 n.4 (internal quotations and citations omitted). The court went on to state that "whether *Sullivan*, as opposed to *Strickland*, should be applied to successive representation cases remains, as far as the jurisprudence of the Supreme Court is concerned, an open question. . . . However, . . . the Sixth Circuit has stated that the rule pronounced in *Sullivan* is inapplicable to cases of successive representations." *Id.* (internal quotations and citations

points to announce new points of law or to change established patterns of practice by the Court."). Moreover, the central issue in *Blake* was whether the State has standing to move to disqualify criminal defense counsel due to a conflict of interest arising from counsel's present or former representation of a State witness. *Id.* at 417-18, 624 S.E.2d at 854-55.

While we have addressed conflict of interest matters subsequent to *Blake*, and on occasion have utilized the *Sullivan* standard for successive representation, a full *Mickens* analysis was not conducted. *See, e.g.*, *Daniel C. v. Ames*, No. 20-0754, 2022 WL 123711, at *2-4 (W. Va. Jan. 12, 2022) (memorandum decision) (finding that the petitioner failed to satisfy either prong of the *Sullivan* test in a successive representation conflict of interest case); *Bennett v. Ballard*, No. 16-0535, 2017 WL 3821805, at *7-8 (W. Va. Sept. 1, 2017) (memorandum decision) (same); *Rogers*, 231 W. Va. 205, 744 S.E.2d 315 (finding no actual conflict existed when a public defender represented the petitioner in a criminal proceeding and another public defender from the same office had previously represented a State witness in the petitioner's current criminal proceeding).

20

omitted). Finding the guidance of the Sixth Circuit to be persuasive, the *Steward* Court applied *Strickland* to the successive representation issue. *Id.*

Several other courts have also applied *Strickland* to successive representation matters. *See, e.g.*, *Weaver v. Wingard*, 163 F. App'x 399, 401 (6th Cir. 2006)) ("[W]e must determine whether this case is one of concurrent representation and thus the *Sullivan* standard controls or whether it is one of successive representation and the *Strickland* standard applies. . . . [The] representations . . . were successive representations and the appropriate standard to review these relationships is the *Strickland* standard."); *Montoya v. Lytle*, 53 F. App'x 496, 498 (10th Cir. 2002) ("The Supreme Court, however, has never extended the [*Sullivan*] standard to cases involving successive, rather than multiple, representation. . . . There is, therefore, no 'clearly established federal law, as determined by the Supreme Court of the United States' mandating reversal of a conviction on a mere showing of a conflict of interest involving successive representation that adversely affected the attorney's representation of his client. . . . Instead, Montoya must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (internal quotations and citations omitted)"); *State v. Alvarado*, 481 P.3d 737, 748-49 (Idaho 2021) ("An attorney actively representing conflicting interests in concurrent representations poses such a circumstance where ineffective assistance is so likely that prejudice may be presumed. However, the same cannot be said for successive representation, especially where the interests involved are unrelated to the former client's case. While successive representation, like in the case at bar, may suggest an apparent

21

conflict of interest, at most it amounts to a cosmetic crack in the exterior of the trial proceedings; the overall foundation—and our confidence in the outcome—remains firm nonetheless. For these reasons, we hold that claims of conflict of interest relating to successive representation require a showing of actual prejudice." (citation omitted)).[21]

We are persuaded by the warning given in *Mickens* regarding the application of *Holloway or Sullivan* in cases of successive representation and the cases that heeded the warning. As the Supreme Court cautioned, "[b]oth *Sullivan* itself, . . . and *Holloway*, . . . stressed the high probability of prejudice arising from *multiple concurrent representation*, and the difficulty of proving that prejudice." *Mickens*, 535 U.S. at 175, 122 S. Ct. at 1245 (emphasis added) (citations omitted). In cases of joint or multiple concurrent representation, requiring a showing of prejudice creates a significant danger to a defendant because the "evil is in what the attorney finds himself compelled to refrain from doing, not only at trial, but also as to possible pretrial plea negotiations and in the sentencing process. Accordingly, it would be difficult, if not impossible, to determine the prejudicial impact on

---

[21] We acknowledge that courts have approached the issue of successive representation following *Mickens* in various ways. *See e.g.*, *Galloway*, 298 So. 3d at 974-75 ("Conflict-of-interest claims . . . are evaluated under one of two separate standards: the *Strickland* standard or the standard from *Cuyler* [*v. Sullivan*], 446 U.S. 335, 100 S. Ct. 1708 [64 L.Ed.2d 333 (1980)]. . . ."); *State v. Phillips*, 711 S.E.2d 122, 137 (N.C. 2011) ("When issues involving successive or simultaneous representation of clients in related matters have arisen before this Court, we have applied the *Sullivan* analysis rather than the *Strickland* framework to resolve resulting claims of ineffective assistance of counsel."). However, for the reasons stated herein, we are persuaded by the Supreme Court's cautionary language in *Mickens*.

the defendant in such cases." *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). This danger of speculating prejudice is not as inherent in successive representation matters.[22]

Without deciding whether *Holloway* or *Sullivan* applies *exclusively* to joint or multiple concurrent representation conflicts, we hold that when constitutional claims of ineffective assistance of counsel based upon successive representation are raised, the individual claiming ineffective assistance of counsel must demonstrate actual prejudice— that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different—pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

---

[22] Similar to its federal counterpart discussed in *Mickens*, 535 U.S. at 175, 122 S. Ct. at 1245, Rule 44(c) of the West Virginia Rules of Criminal Procedure provides extra protection to defendants regarding the potential dangers of joint representation by requiring the lower court to specifically address each defendant about such representation:

> (c) *Joint Representation*.—Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

W. Va. R. Crim. P. 44.

We now apply the analysis under *Strickland*'s second prong to determine whether A.B. has demonstrated that she was prejudiced or that the outcome of her trial would have been different but for the trial court's refusal to relieve Ms. Smith from her representation. A.B. effectively contends that K.S.'s testimony would have been nullified if her counsel had been allowed to conduct a thorough cross-examination of K.S. Thus, under *Strickland*, there is no prejudice if there was sufficient evidence for the jury to convict A.B. without K.S.'s testimony.

K.S.'s testimony consisted of a mere two-and-a-half pages. While K.S. testified that she was the individual who first found the infant G.B. under A.B. and could not wake A.B., the State presented copious other evidence to support the jury's verdict. The State's witnesses provided testimony amounting to almost 200 pages of additional direct and redirect testimony that included Grandmother also finding G.B. under A.B. shortly after K.S., as well as, the testimony of Grandmother, emergency responders, and medical professionals regarding the mental status and intoxication of A.B. and the living conditions to which A.B. had subjected her children, including the numerous empty alcohol bottles. Simply put, there was overwhelming evidence, other than K.S.'s brief testimony, that demonstrated A.B.'s guilt to all three counts. *See State ex rel. Shelton v. Painter*, 221 W. Va. 578, 586, 655 S.E.2d 794, 802 (2007) (per curiam) ("Insofar as the guilty phase of the trial is concerned, we agree with the trial court's finding that '. . . even if counsel's performance was deficient, then counsel's deficient performance DID NOT adversely affect the outcome of the trial as there was overwhelming evidence of the Petitioner's

[appellant's] guilt.'" (alteration in original)). Given that A.B. cannot demonstrate that the outcome of the case would have changed, we find no error.

### B. Exculpatory Brady Evidence

In her supplemental brief, A.B. asserted that the State failed to turn over certain juvenile records of K.S. in violation of *Brady*. The State disputes that it failed to turn over any such material. We find no merit in A.B.'s contention that a *Brady* violation occurred.

As a general matter, "'[a] *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused.'" *State v. Morris*, 227 W. Va. 76, 84, 705 S.E.2d 583, 591 (2010) (per curiam) (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 869-70, 126 S. Ct. 2188, 2190, 165 L. Ed. 2d 269 (2006)). We have explained the requirements that must be satisfied for establishing a *Brady* violation as follows:

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

Syl. pt. 2, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007). "This test is applied in a conjunctive manner, meaning that all three elements must be satisfied[.]" *State ex rel. Hubley v. Pszczolkowski*, No. 19-0211, 2020 WL 7214158, at *10 (W. Va. Dec. 7, 2020)

25

(memorandum decision). *See also Skinner v. Switzer*, 562 U.S. 521, 536, 131 S. Ct. 1289, 1300, 179 L. Ed. 2d 233 (2011) ("To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings[.]").

We need not determine whether the first two components are satisfied because A.B. cannot meet the third requirement regarding materiality of the evidence at issue.[23] The evidence at issue—juvenile records of K.S.— were not a material element of the evidence, the absence of which prejudiced A.B. Regarding the third component, this Court previously observed in *Youngblood*,

> that "'[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ["]reasonable probability["] is a probability sufficient to undermine the confidence in the outcome.'" *State v. Fortner*, 182 W. Va. 345, 353, 387 S.E.2d 812, 820 (1989) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985)).

221 W. Va. at 32, 650 S.E.2d at 131. The petitioner must show that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Ct. 1555, 1558, 131 L. Ed. 2d 490 (1995); *see also Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763,

---

[23] To be clear, this Court is not making a finding that the first two *Brady/Youngblood* factors were met. The State disputes that it failed to turn over any such material. In fact, during the trial, there was a discussion concerning the psychology records that defense counsel already possessed and then the State indicated that it had never seen those records.

26

766, 31 L. Ed. 2d 104 (1972) (holding that reversal is not required where undisclosed evidence was possibly useful to the defense but not likely to have changed the verdict). Additionally, the withheld evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 2402, 49 L. Ed. 2d 342 (1976).

Again, the State presented extensive evidence during the trial from several witnesses regarding all three counts. The witnesses described the circumstances surrounding G.B. being found, suffocated, under A.B. and A.B.'s intoxication. K.S.'s grandmother, who lived in the same house, provided similar testimony in even greater detail. Five witnesses testified as to A.B.'s intoxication on November 7, 2015, including the emergency room doctor who treated A.B. and found her blood alcohol content was .289. Moreover, witnesses described the deplorable living conditions in the home and the harm that can come to a child living in those circumstances.

Examining K.S.'s juvenile records within the totality of the evidence,[24] we do not find that the result of A.B.'s trial would have been different if the records had been disclosed to the defense. Even if A.B. had the records to cross-examine K.S., and that cross-examination caused the jury to the doubt the reliability of K.S.'s testimony, such doubt would not have affected the jury's verdict because of the overwhelming evidence of A.B.'s

---

[24] K.S.'s alleged juvenile records at issue were at least two years after G.B.'s death.

27

guilt as to all three counts. Given the evidence supporting A.B.'s guilt from witnesses other than K.S., the juvenile records would not have been sufficient to place the whole case in "such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S. Ct. at 1558. Consequently, we find that the third component of the *Brady/Youngblood* analysis has not been satisfied and that the decision of the lower court should be affirmed.

## IV.

## CONCLUSION

For the reasons set forth above, we affirm.

Affirmed.